United States District Court
Middle District of Florida
Tampa Division

LISA C. RIOS,

     *Plaintiff,*

V.                                             No. 8:16-CV-152-T-PDB

ACTING COMMISSIONER OF SOCIAL SECURITY,

     *Defendant.*

---

## Order Affirming Commissioner's Decision

This is a case under 42 U.S.C. §§ 405(g) and 1383(c)(3) to review a final decision of the Acting Commissioner of Social Security denying Lisa Rios's claim for disability insurance benefits and supplemental security income.[1] She seeks reversal, Doc. 22; the Commissioner, affirmance, Doc. 25.

---

[1]The Social Security Administration uses an administrative review process a claimant ordinarily must follow to receive benefits or judicial review of their denial. *Bowen v. City of New York*, 476 U.S. 467, 471−72 (1986). A state agency acting under the Commissioner's authority makes an initial determination. 20 C.F.R. §§ 404.900−404.905, 416.1400−416.1405. If the claimant is dissatisfied with the initial determination, she may ask for reconsideration. 20 C.F.R. §§ 404.907−404.918, 416.1407−416.1418. If she is dissatisfied with the reconsideration determination, she may ask for a hearing before an Administrative Law Judge ("ALJ"). 20 C.F.R. §§ 404.929−404.943, 416.1429−416.1443. If she is dissatisfied with the ALJ's decision, she may ask for review by the Appeals Council. 20 C.F.R. §§ 404.967−404.982, 416.1467−416.1482. If the Appeals Council denies review, she may file an action in federal district court. 20 C.F.R. §§ 404.981, 416.1481. Sections 405(g) and 1383(c)(3) provide the bases for the Court's jurisdiction.

The Commissioner substantially revised the regulations on the consideration of medical evidence for claims filed on or after March 27, 2017. *See* 82 Fed. Reg. 5844-01, 5844 (Jan. 18, 2017). Because Rios filed her claim before that date, all citations are to the regulations in effect on the date of the ALJ's decision unless otherwise stated.

## I.    Background

Rios was born in 1964 and last worked in 2009. Tr. 57, 133, 158. She has a two-year degree and experience as a hair stylist. Tr. 159. She alleges she became disabled in January 2009 from a pulmonary embolus, chronic pleurisy, anxiety, chest pain, abdominal pain, and shortness of breath. Tr. 158. She is insured through 2014. Tr. 152, 154. She proceeded through the administrative process, failing at each level. Tr. 1–6, 33–45, 75–76, 85–86, 89–97, 99–103. She appealed to this Court; the Commissioner moved to remand; and the Court remanded for further agency proceedings. Tr. 851–52; *see Rios v. Comm'r of Soc. Sec.*, 8:14-cv-2259-T-AEP.

On remand from the Court, the Appeals Council remanded to the Administrative Law Judge ("ALJ") to reevaluate the 2012 opinion of Dr. Joyce Thomas and, if necessary, obtain additional evidence, reconsider other opinion evidence, reevaluate Rios's residual functional capacity ("RFC"), and reevaluate her subjective complaints. Tr. 861–62. The ALJ issued a decision in September 2015 again finding her not disabled. Tr. 784–95. This case followed. Doc. 1.

## II.    Evidence

This order adopts the summaries of evidence in the ALJ's decision, Tr. 789–91, and in the parties' briefs, Doc. 22 at 1–4; Doc. 25 at 1–3. Some evidence pertinent to Rios's arguments is also summarized below.

In February 2012, Dr. Thomas wrote a letter concerning Rios's condition. Tr. 671. She explained Rios had been a patient at her clinic since 2010 and had been diagnosed with deep-vein thrombosis and pulmonary embolus in December 2008. Tr. 671. She explained that since then, Rios has experienced chronic chest and abdominal pain and had seen pulmonologists "with no resolution of her symptoms." Tr. 671. She opined the abdominal pain is "debilitating and impacts [Rios's] activities of daily living," and Rios cannot sit or stand for extended time. Tr. 671. She stated Rios had been evaluated by a cardiologist, and a cardiac catheterization was normal, though

her chest pain persists. Tr. 671. She explained Rios's pain is "so severe that she is seeing a pain management specialist to keep the pain under some control." Tr. 671. She opined Rios's breathing has been "compromised," requiring her to use inhalers, which worsen her chest pain. Tr. 671. She opined Rios has "severe anxiety that is very difficult to control" and prevents her from concentrating. Tr. 671. She explained Rios takes medication for anxiety but "still has severe breakthrough symptoms." Tr. 671. She opined Rios has depression, which "also impairs her function." Tr. 671. She explained Rios was diagnosed with obstructive sleep apnea in 2010 and uses a CPAP machine to sleep. Tr. 671. She explained Rios has "dysfunctional uterine bleeding and has episodes where the bleeding is difficult to control." Tr. 671. She explained Rios was recently evaluated for "hypercoaguable state," bloodwork was "impossible due to problems with her blood vessels," and she was being seen by a vascular surgeon. Tr. 671.

In August 2015, Dr. Thomas completed a form providing the following opinions on Rios's ability to perform work-related activities. Tr. 1207–09. Rios can lift less than 10 pounds occasionally and negligible weight frequently. Tr. 1207. Those limitations arise from Rios's inability to bend forward, constant neck and back pain, limited spinal range of motion, and constant abdominal pain. Tr. 1207. Rios can stand and walk less than 2 hours in an 8-hour workday and sit less than 2 hours in an 8-hour workday with normal breaks. Tr. 1207. Those limitations arise from Rios's constant neck, back, and abdominal pain and shortness of breath. Tr. 1207. Rios can sit for 30 minutes and stand for 15 minutes before changing position, needs to walk around every hour for about 15 minutes, and requires the ability to shift at will from sitting to standing or walking. Tr. 1207–08. Those limitations arise from Rios's neck, back, and abdominal pain, and long periods of sitting or standing worsen the pain. Tr. 1207–08. Rios must lie down about 3 times an hour at unpredictable intervals. Tr. 1208. That limitation arises from chronic abdominal pain. Tr. 1208. Rios's impairments—including chronic and constant pain, shortness of breath, and anxiety—would cause her to be absent from work more than three times a month. Tr.

1208. Rios can occasionally balance but never climb, stoop, crouch, kneel, or crawl because of neck, back, and abdominal pain. Tr. 1208. Rios's abilities to reach, push, and pull are "significantly" limited because of pain and shortness of breath. Tr. 1208. Rios's impairments cause several environmental restrictions that render her unable to function: heights, moving machinery, temperature extremes, chemicals, dust, noises, fumes, humidity, and vibrations. Tr. 1208–09. Rios's shortness of breath worsens when exposed to those conditions. Tr. 1209. Rios has depression and anxiety that impair her concentration and headaches that cause dizziness. Tr. 1209. Some of Rios's medications "cause drowsiness, sedation, [and] impaired concentration." Tr. 1209. Her opinions are consistent with records showing Rios "has had pain in the spine due to degenerative disc disease," "has chronic abdominal pain after a procedure on her lungs," and "remains depressed and anxious." Tr. 1209.

At a 2012 hearing, Rios testified as follows.

She can read and write English and Spanish and do simple math. Tr. 57. She last worked in November 2008, when she opened a salon. Tr. 58. She experienced heavy bleeding in mid-November, and it worsened in mid- to late December to the point that she sought emergency care. Tr. 58. She developed deep-vein thrombosis in her left arm at that time and "was never the same after that." Tr. 58. She could no longer do hair, use her arm, or lift five pounds, and her arm was in a sling for months. Tr. 58. After a month-long hospital stay that included two weeks in the intensive-care unit, she returned to her salon but could not stand, sit, use her arms, or run the business. Tr. 58. The veins in her left arm remain damaged, and she also developed clots in veins in her right arm such that she cannot have blood drawn or receive IVs in either arm. Tr. 58.

She has pain in her upper abdomen resulting from separation of tissue around her lung, inflammation of the chest wall, and problems with her liver, gallbladder, and pancreas. Tr. 59–60. The pain is constant, and she "feels like there's an arrow stuck in [her] body." Tr. 60. She also experiences shoulder pain and has received

"shots" for it. Tr. 60–61. She has headaches every morning when she wakes up and "always ha[s] a slight headache and … underlying nausea." Tr. 61. She experiences shortness of breath all day. Tr. 65. Being around cleaning products exacerbates breathing problems. Tr. 65–66. Her legs ache due to venous insufficiency, so she has to elevate them. Tr. 66. She also has foot pain from bone spurs. Tr. 67. Uterine fibroids and bleeding have been "ongoing problem[s]" requiring several hospital visits. Tr. 67–68.

She receives pain medication, anti-inflammatory medication, antidepressants, and anti-anxiety medication and uses inhalers and a CPAP machine. Tr. 59. She sometimes feels claustrophobic wearing the mask and has panic attacks. Tr. 59. Other times she wakes up from pain. Tr. 59. She cannot wear the mask when she is awake. Tr. 59. She does not see a psychiatrist or psychologist for anxiety. Tr. 61.

Her arms tingle, and she cannot lift much weight but can hold a glass or cup. Tr. 58–59. She can fasten buttons and use her hands as long as she does not overexert herself. Tr. 59. She can carry a small laundry basket, though she does "very little" housework. Tr. 59. She believes she can stand or walk for 10 or 15 minutes before needing to stop and sit down. Tr. 62. She can sit for 10 to 20 minutes before needing to change positions. Tr. 62. She does not believe she can lift any amount of weight frequently or occasionally. Tr. 62–63.

She spends most of her days "lay[ing] around and think[ing] and worry[ing] and wonder[ing] why this has happened" to her. Tr. 63. She takes care of house plants, and her dog and children keep her company. Tr. 63. She does not attend church. Tr. 63. Using a computer gives her a headache, though she occasionally looks at emails and uses Facebook. Tr. 63. She used to exercise but no longer does. Tr. 63–64. She can drive but "hardly" leaves the house. Tr. 64. She drives one to three times a month to attend doctor's appointments and go grocery shopping. Tr. 64. She shops for groceries about once a month and needs to "psych [her]self up" to go. Tr. 64. Pushing the cart and walking are difficult. Tr. 65. She can dress and shower

independently. Tr. 64. She does not cook often because it is difficult to lift and empty pots and clean the dishes. Tr. 64. She can make a sandwich or microwave food when she is hungry, though she does not "have much of an appetite." Tr. 64. She does "[v]ery light" household chores but cannot sweep or mop. Tr. 65. She does not shower daily because she sometimes does not want to. Tr. 66. She sometimes does crossword puzzles, but they give her headaches. Tr. 66. She enjoys reading but "get[s] sleepy right away" due to her medication. Tr. 66–67.

At a 2015 hearing, Rios testified as follows.

Her salon closed a year after her hospitalization in December 2008 for deep-vein thrombosis and a pulmonary embolism because she was unable to return to work. Tr. 809. Dr. Thomas treats her for chronic abdominal pain, anxiety, and depression. Tr. 809, 811. The pain might result from an enlarged spleen or blood clots having spread to an organ. Tr. 809. Pain medication helps "somewhat." Tr. 810. She uses inhalers. Tr. 810. The CPAP machine helps with sleep apnea, but she still does not get good sleep because she wakes up from pain. Tr. 810. She cannot use her arm fully due to a permanent rotator-cuff injury. Tr. 811. She has gone to physical therapy a couple of times and does exercises at home. Tr. 811. She takes medication for anxiety and depression, which helps. Tr. 811. She experiences shortness of breath when she walks too much or overexerts herself. Tr. 811–12. She can walk for about 10 minutes and has to reposition herself about every 15 to 30 minutes. Tr. 812. She can comfortably lift less than 5 pounds for 5 or 6 hours in an 8-hour day. Tr. 812.

She can shower, "do some dishes," do laundry, and start to prepare some meals, though she does not "do much housework at all" and receives a lot of help from her husband and daughter. Tr. 813. She can do housework in 15- to 30-minute increments before needing to lie down on her side and apply pressure to the area that hurts. Tr. 813. She has to lie down for at least 30 minutes at a time but sometimes lies down for 2 hours. Tr. 814. Medication makes her "drowsy, sleepy, [and] fatigued." Tr. 814. She gained about 65 pounds over the last 12 to 18 months. Tr. 817. The weight gain makes

it harder to move around and be active and increases her shortness of breath. Tr. 817. She sometimes has trouble focusing because of medication and pain. Tr. 818. She can stay focused for about 15 minutes and cannot return to a task for 30 minutes to an hour. Tr. 818. She became depressed as a result of her health problems. Tr. 818. She had to go through bankruptcy proceedings due to medical bills and the loss of her business. Tr. 818–19.

The ALJ asked a vocational expert ("VE") to consider a hypothetical person of Rios's age with her education and work experience who could lift up to 20 pounds occasionally and up to 10 pounds frequently; stand or walk for about 6 hours and sit for about 6 hours in an 8-hour day with normal breaks; occasionally perform all postural activities, including climbing ladders, ropes, and scaffolds, balancing, stooping, kneeling, crouching, and crawling; occasionally reach overhead with her left arm; would need to avoid concentrated exposure to irritants and hazards; could perform work with a specific vocational preparation of 1 or 2; and could perform only simple, routine, or repetitive tasks. Tr. 821. He asked whether that person could perform Rios's past work. Tr. 821–22. The VE responded no. Tr. 822. He asked whether that person could perform any other job. Tr. 822. The VE responded yes and identified marker, bagger, and final inspector. Tr. 822.

The ALJ asked whether a person with those limitations who would also have two unexcused absences a month could perform any available job. Tr. 822. The VE responded no. Tr. 822.

Rios's counsel asked whether a person from the first hypothetical who would also have to alternate between sitting and standing every 15 to 30 minutes could perform any of the identified jobs. Tr. 822. The VE responded the person would be unable to perform the marker job but could perform about 50 percent of the bagger jobs and about 85 percent of the inspector jobs. Tr. 823. He asked whether a person from the first hypothetical who had to alternate between sitting, standing, and lying down about every 15 to 30 minutes could perform any job. Tr. 823. The VE responded

no. Tr. 823. He asked whether a person from the first hypothetical who could never climb, stoop, crouch, kneel, or crawl would be able to perform the identified jobs. Tr. 823–24. The VE responded those limitations might affect some marker jobs but would not affect the ability to perform the inspector or bagger jobs. Tr. 824. He asked whether a person from the first hypothetical who would be off-task at least 25 percent of the time could perform any job. Tr. 824. The VE responded no and elaborated that being off-task about 25 percent of the time might be "the difference between sheltered or supported and no employment." Tr. 825.

## III. ALJ's Decision

At step one,[2] the ALJ found Rios has not engaged in substantial gainful activity since January 1, 2009. Tr. 786.

At step two, the ALJ found Rios suffers from severe impairments of left-arm deep-vein thrombosis, pulmonary embolus with associated abdominal and chest pain, left rotator-cuff tear, obesity, and adjustment disorder with anxiety. Tr. 786. He found her obstructive sleep apnea and headaches are nonsevere. Tr. 786. He observed that though examiners had diagnosed her with obstructive sleep apnea, he could "find no sleep studies of record," and the record contained conflicting pulmonary-functioning tests. Tr. 786. He observed her complaints of headaches are unsupported by objective medical findings such as "abnormal brain scans." Tr. 786–87.

At step three, the ALJ found Rios has no impairment or combination of impairments that meets or medically equals the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 787–88. He particularly considered

---

[2]The Social Security Administration uses a five-step sequential process to decide if a person is disabled, asking whether (1) she is engaged in substantial gainful activity, (2) she has a severe impairment or combination of impairments, (3) the impairment meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) she can perform any of her past relevant work given her RFC, and (5) there are a significant number of jobs in the national economy she can perform given her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

listings 1.00ff (musculoskeletal system), 3.00ff (respiratory system), 4.00ff (cardiovascular system), 5.00ff (digestive system), 12.04 (affective disorders), and 12.06 (anxiety-related disorders). Tr. 787.

The ALJ considered the "paragraph B"[3] criteria to determine if Rios's mental impairments meet or equal the criteria of a listing. Tr. 787–88. He found she has a mild restriction in activities of daily living; mild difficulties in social functioning; and moderate difficulties maintaining concentration, persistence, and pace; and she has had no episode of decompensation of extended duration. Tr. 787–88. He also considered the "paragraph C"[4] criteria and found she does not meet them. Tr. 788.

After stating he had considered the entire record, the ALJ found Rios has the RFC to perform light work[5] as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with additional limitations:

> The claimant can lift up to twenty pounds occasionally and lift and carry up to ten pounds frequently. The claimant can stand and walk for six hours out of an eight-hour workday and sit for six hours out of an eight-hour workday with normal breaks. The claimant can occasionally climb ramps, stairs, ropes, scaffolds, and ladders; balance; stoop; crouch; crawl; and kneel. The claimant can occasionally lift overhead with the left arm.

---

[3]The criteria in paragraph B are used to assess functional limitations imposed by medically determinable mental impairments. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(C) (eff. Aug. 12, 2015). Paragraph B requires a disorder of medically documented persistence resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulty maintaining social functioning; (3) marked difficulty maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Part 404, Subpart P, App'x 1 §§ 12.04B, 12.06B (eff. Aug. 12, 2015).

[4]Paragraph C lists additional functional criteria for some listings. 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00(A) (eff. Aug. 12, 2015).

[5]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. " 20 C.F.R. §§ 404.1567(b), 416.967(b).

The claimant must avoid concentrated exposure to pulmonary irritants, such as fumes, dust, gases, and hazards. The claimant is limited to unskilled work, defined as having an SVP 1 or 2, simple, routine, repetitive tasks.

Tr. 788.

In assessing the RFC, the ALJ considered Rios's testimony and found that although her medically determinable impairments could have caused the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible. Tr. 789–91. He observed that, after her deep-vein thrombosis and related pulmonary embolism, "most of [her] symptoms are of an unknown etiology," citing tests from 2009 to 2011 with normal results or results that do not support the alleged severity of her symptoms. Tr. 789. On her shortness of breath, he observed she had undergone a pulmonary function test in April 2010 showing "moderately severe restricted airflow," a spirometric test in November 2012 showing normal functioning, and chest x-rays in May 2012 showing no infiltrates, and she often had reported no shortness of breath. Tr. 790. He observed the evidence supported some limitation in using her left arm. Tr. 790. He observed Dr. Rand Altemose opined that her symptoms "were not venous in etiology" and noted that, as of February 2012, she had not experienced any reoccurrence since the original thrombotic or embolic episode. Tr. 790.

The ALJ observed Rios's treatment "decreased significantly" during 2013, 2014, and 2015. Tr. 790. He observed she had sought treatment for abdominal and back pain, sleep disturbances, and occasional shortness of breath but had several examinations during that time that resulted in normal findings aside from her reports of abdominal tenderness. Tr. 790. He observed her consultative examinations had "revealed few abnormalities." Tr. 790–91. On her mental symptoms, he observed she had regularly complained of depression, anxiety, and sleep disturbance but had not sought specialized care and "conceded her medications improve[] her symptoms." Tr. 790.

The ALJ found Rios's activities of daily living, "[a]lthough not entirely dispositive of the issue," were consistent with the assessed RFC. Tr. 791. He pointed to her reports in 2009 that she was still working as a hairdresser; her report in 2014 that she took care of her infant grandson; her report to consultative examining physician Dr. Jeremy Zehr that she watched television, read self-help books, and did light cooking and cleaning (and Dr. Zehr's opinion that she had an "active social life" and her daily activities were "appropriate"); and her statement in her function report that she could drive, manage her finances, use a computer, and socialize. Tr. 791.

The ALJ found Rios's reports of symptoms had not been consistent, and she had not fully complied with treatment plans. Tr. 791. He pointed to her inconsistent allegations of shortness of breath and many examinations showing normal pulmonary findings, the inconsistency between her allegations of high levels of pain and the frequent notation in treatment records that she was in no apparent distress, her failure to comply with her Plavix and baby aspirin prescriptions in February 2012, her decision to decline depression medication in February 2011, and her weight gain despite instructions from her physicians to lose weight. Tr. 791. He also found her "course of treatment d[id] not support the severity of" her symptoms, pointing to her failure to seek specialized mental-health treatment and the "dramatic[]" decrease in treatment beginning in 2013. Tr. 791.

The ALJ emphasized the repeated statements of Rios's physicians that they could not find the etiology of her symptoms. Tr. 791. He noted that Dr. Ovidiu Grigoras had described her as "exhibiting hypochondriac behavior," that she had persistently raised the possibility that she had cancer despite her doctors telling her she does not, and that she had reported experiencing a mild heart attack despite no supporting evidence. Tr. 791–92. He found the evidence "suggests that [her] reports of her symptoms may not be … entirely accurate." Tr. 792.

The ALJ gave little weight to Dr. Thomas's 2012 and 2015 opinions. Tr. 792–93. He observed Dr. Thomas opined Rios "'is not able to function,'" but "the claimant

has reported decent activities of daily living on a number of occasions." Tr. 792. He observed Rios had not "sought consistent treatment" with Dr. Thomas, pointing to a treatment note indicating she had not seen Dr. Thomas from June 2013 to October 2014 and the absence of treatment notes from Dr. Thomas in 2014 and 2015. Tr. 792. He found the lack of frequent contact suggested Dr. Thomas did not base her opinions "entirely on her own records." Tr. 792. He found that finding particularly significant given Rios's decrease in treatment overall beginning in 2013, which he stated Dr. Thomas had not explained. Tr. 792. He found Dr. Thomas's opinions inconsistent with other physicians' findings. Tr. 792. He pointed to the inconsistency between her opinion that Rios has "constant" abdominal pain and Rios's failure to report abdominal pain on several occasions and notes indicating she was not in acute distress. Tr. 792–93. He also pointed to the inconsistency between her statement Rios has shortness of breath and records showing no breathing problems. Tr. 793. He observed Dr. Thomas made no mention of Rios's left-shoulder impairment, "bring[ing] into question the degree of care [she] took" in providing her opinions. Tr. 793. He rejected her opinions on Rios's mental impairments because she is not a mental-health specialist, and her opinions contradicted Dr. Zehr's detailed findings. Tr. 793.

At steps four and five, the ALJ found Rios cannot perform her past relevant work[6] as a hair stylist but can perform jobs the VE had identified (marker; bagger, light; and production inspector) and those jobs exist in significant numbers in the national economy. Tr. 794–95. He therefore found no disability. Tr. 795.

## IV.    Standard of Review

A court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports his

---

[6]"Past relevant work is work [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough … to learn to do it." 20 C.F.R. §§ 404.1560, 416.960.

findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* A court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Id.* A court must affirm the ALJ's decision if substantial evidence supports it, even if the evidence preponderates against the factual findings. *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).

## V. Analysis

### A. *Credibility*

Rios argues the ALJ erred in evaluating her credibility by (1) failing to properly consider the effect of her alleged sleep disturbance on her RFC; (2) failing to account for her work history; (3) failing to consider her medication regimen and other treatment efforts; and (4) finding her not credible because she failed to lose weight. Doc. 22 at 4–7.

The Commissioner responds: (1) though the ALJ erroneously stated the record did not contain evidence of a sleep study, the error was harmless because the ALJ applied the proper legal standard and found Rios's sleep apnea was not a severe impairment; (2) the ALJ's questioning of Rios during the hearing demonstrates he considered her work history, and nothing required him to discuss work history in evaluating her credibility; (3) the ALJ adequately considered her treatment and found its conservative nature undermined her allegations; and (4) even assuming he should not have considered her failure to lose weight, he relied on several other reasons in finding her not entirely credible. Doc. 25 at 8–10.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). A claimant must prove she is disabled. 20 C.F.R. §§ 404.1512, 416.912.

At step two, an impairment is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a). Severity "must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986).

Step two "acts as a filter; if no severe impairment is shown the claim is denied, but the finding of any severe impairment … is enough to satisfy the requirement." *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987). Failure to find an impairment severe at step two is harmless if the ALJ moves on to step three and considers the claimant's conditions in combination in the rest of the decision. *Medina v. Soc. Sec. Admin.*, 636 F. App'x 490, 492–93 (11th Cir. 2016). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

A claimant's RFC is the most she can still do despite her limitations. 20 C.F.R. § 416.945(a)(1). The Social Security Administration uses the RFC at step four to decide if she can perform any past relevant work and, if not, at step five with other factors to decide if there are other jobs in significant numbers in the national economy she can perform. 20 C.F.R. §§ 404.1545(a)(5), 416.945(a)(5). To determine the RFC, an ALJ considers all relevant evidence, including medical evidence and the claimant's description of pain or limitations. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). But "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the Court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal quotation marks omitted). The "mere existence" of an impairment does not

reveal its effect on a claimant's ability to work or undermine RFC findings. *Moore, 405 F.3d at 1213 n.6.*

In evaluating a claimant's subjective complaints of pain or other symptoms, an ALJ must determine whether there is an underlying medical condition and either (1) objective medical evidence confirming the severity of the alleged symptom arising from that condition or (2) evidence the condition is so severe that it can be reasonably expected to cause the alleged symptom. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).

If the objective medical evidence does not confirm the alleged severity of a claimant's symptom, but an impairment can be reasonably expected to cause that alleged severity, an ALJ must evaluate the intensity and persistence of her alleged symptoms and their effect on her ability to work. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). In doing so, an ALJ must consider all available evidence, including objective medical evidence, statements from the claimant and others, "information about [a claimant's] prior work record," and "[t]he type, dosage, effectiveness, and side effects of any medication" and treatment other than medication a claimant receives. 20 C.F.R. §§ 404.1529(c)(2)–(3), 416.929(c)(2)–(3). An ALJ also must consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

If an ALJ discredits a claimant's testimony about the intensity, persistence, and limiting effects of a symptom, such as pain, he must provide "explicit and adequate reasons for doing so." *Holt*, 921 F.2d at 1223. An ALJ's credibility determination need not "cite particular phrases or formulations" but "cannot merely be a broad rejection which is not enough to enable [a court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal quotation marks omitted). "A clearly articulated credibility finding with substantial supporting evidence in the record will not be

disturbed by a reviewing court." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995). A reviewing court should ask not whether the ALJ could have reasonably credited a claimant's testimony, but whether the ALJ had been clearly wrong in discrediting it. *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

An ALJ may find a claimant not disabled if she fails to follow prescribed treatment "without a good reason." 20 C.F.R. §§ 404.1530(b), 416.930(b). In *McCall v. Bowen*, the claimant alleged she was disabled due to arthritis and back and heart problems. 846 F.2d 1317, 1318 (11th Cir. 1988). In finding her not disabled, the ALJ referenced the claimant's obesity. *Id.* at 1319. The Eleventh Circuit observed "the finding of no disability was colored by the implication that [the claimant's] obesity was remediable," and "[t]he district court explicitly relied on this presumption." *Id.* The court recognized the rule permitting a finding of no disability based on a claimant's unjustified failure to follow a prescribed course of treatment "that could restore her ability to work." *Id.* But it determined that standard had not been met, observing "[a] physician's recommendation to lose weight does not necessarily constitute a prescribed course of treatment, nor does a claimant's failure to accomplish the recommended change constitute a refusal to undertake such treatment." *Id.* The court held the claimant's obesity on its own did not justify concluding she had refused treatment and remanded for further findings and conclusions. *Id.*

1.    *Sleep-Disturbance Symptoms*

Observing the ALJ said he could "find no sleep studies of record," Tr. 786, but there in fact is one in the record, Rios contends the ALJ erroneously failed to consider evidence of sleep disturbances "when determining her credibility regarding her symptoms and determining the [RFC]." Doc. 22 at 5. Rios appears to argue substantial evidence does not support the ALJ's finding that her obstructive sleep apnea is not severe and the error is not harmless because it affected the ALJ's later credibility analysis.

Even if substantial evidence does not support the ALJ's step-two finding that Rios's obstructive sleep apnea is not a severe impairment because it was based in significant part on the failure to find the sleep study, Rios has not satisfied her burden of showing the error is harmful. The ALJ moved to step three and, evident from the decision, considered all of her impairments—including obstructive sleep apnea—in combination in the rest of the decision. *See Medina*, 636 F. App'x at 492–93. The ALJ observed she had sought treatment for disturbed sleep and regularly complained about disturbed sleep. Tr. 790−91. He did not reject any testimony concerning waking up frequently from sleep apnea or pain or experiencing fatigue,[7] did not reference any lack of sleep study when discussing her credibility, and found she has moderate difficulty maintaining concentration, persistence, and pace and accordingly limited her to unskilled work with only simple, routine, repetitive tasks. *See* Tr. 787–88. No evidence suggests obstructive sleep apnea caused work-related limitations beyond those.

## 2. *Work History*

Rios contends the ALJ committed reversible error by "failing to take into account [her] work history and [her] loss of investment in her business." Doc. 22 at 5–6.

The ALJ's decision demonstrates he was aware of and considered Rios's strong work history, *see* Tr. 794 (citing record containing VE's statement of Rios's 29-year work history as hair stylist, *see* Tr. 923), but found her statements about the severity of her symptoms not entirely credible for other reasons. He was not required to do more. *See Spencer v. Colvin*, No. 4:14-cv-01121-JHE, 2015 WL 5579794, at *4 (N.D. Ala. Sept. 22, 2015) (unpublished) (rejecting claimant's argument that ALJ erred in failing to mention his strong work history; explaining he cited "no authority evidence

---

[7]Some records reflect complaints of fatigue but no accompanying complaints of sleep disturbance. *See, e.g.*, Tr. 511–12, 690, 1117, 1152, 1157, 1165, 1170. Whether Rios's fatigue results from interrupted sleep or something else, she has pointed to no evidence of its severity or limiting effects.

… of a strong work history must be specifically mentioned and rejected for an ALJ to state a proper credibility analysis"); *Coleman v. Astrue*, No. 8:11-cv-1783-T-TGW, 2012 WL 3231074, at *5 (M.D. Fla. Aug. 6, 2012) (unpublished) ("While the [ALJ] did not discuss the plaintiff's work history specifically in the context of her credibility finding, she obviously considered the plaintiff's work history in making her decision."); *cf. Dyer*, 395 F.3d at 1211 (ALJ's credibility determination need not "cite particular phrases or formulations"). Though Rios's work history could have supported a finding her statements about her symptoms credible, the Court's role is to determine whether the ALJ was clearly wrong in discrediting her testimony, not whether he could have credited it. *See Werner*, 421 F. App'x at 939.

Some courts have held an ALJ commits reversible error by failing to consider a claimant's strong work history. *See, e.g.*, *Lafond v. Comm'r of Soc. Sec.*, No. 6:14-cv-1001-Orl-DAB, 2015 WL 4076943, at *9 (M.D. Fla. July 2, 2015) (unpublished) (citing cases). Whether because the cases are factually distinguishable (in that they involve circumstances where the ALJ apparently failed to even consider work history) or inconsistent with binding precedent requiring deference to a "clearly articulated credibility finding with substantial supporting evidence," *see Foote*, 67 F.3d at 1562 (quoted), the Court finds those cases unpersuasive.

3.  *Medication and Treatment*

Rios contends the ALJ failed to take into account the quantity of medication she takes or her doctors' consistent efforts in referring her to specialists to determine the source of her pain. Doc. 22 at 6–7.

As with her argument concerning her work history, by highlighting her medication regimen and frequent referrals for testing, Rios points to evidence that could have bolstered her credibility rather than challenging the ALJ's reasons for discrediting it. The ALJ discussed in detail her treatment records, and it is unreasonable to assume he was unaware of her prescriptions. That she had been prescribed several medications for various problems says nothing about the degree of

limitation she experiences from her impairments. That fact supports that her impairments exist, but the "mere existence" of an impairment does not reveal its effect on a claimant's ability to work or undermine RFC findings. *Moore*, 405 F.3d at 1213 n.6.

Rios appears to rely on an inference that her treating physicians prescribed medication and referred her for testing because they "believe[d] in her." *See* Doc. 22 at 7. That her doctors credited her reports of symptoms does not mean the ALJ was required to entirely credit in full everything she said. Instead, he was required to, and did, independently evaluate her subjective complaints and provide reasons supported by substantial evidence for not fully crediting them.[8]

*4.     Failure to Lose Weight*

Rios contends the ALJ erred in discounting her subjective complaints based on her weight gain despite instructions from her physicians to lose weight. Doc. 22 at 8.

Though the ALJ described Rios's weight gain despite being told to lose weight in his credibility analysis, he did not rely on that failure alone to find her not disabled. Instead, he considered her failure to lose weight in combination with other evidence she had not fully complied with her treatment plan as one of several reasons for finding her subjective complaints not entirely credible. Even accepting that the ALJ

---

[8]Rios cites *Somogy v. Commissioner of Social Security*, 366 F. App'x 56 (11th Cir. 2010), without a pinpoint citation and without explaining its relevance. *See* Doc. 22 at 7. *Somogy* involved a claimant with fibromyalgia. In rejecting the ALJ's reasoning that a treating physician's opinion was entitled to less weight because it was based on the claimant's subjective complaints, the court explained, "We, along with several other circuits, have recognized that fibromyalgia often lacks medical or laboratory signs[] and is generally diagnosed mostly on an individual's described symptoms, and that the hallmark of fibromyalgia is therefore a lack of objective evidence. The lack of clinical findings is, at least in the case of fibromyalgia, therefore insufficient alone to support an ALJ's rejection of a treating physician's opinions." *Id.* at 63–64 (internal quotation marks and citations omitted). To the extent Rios attempts to analogize the facts in *Somogy* to her case, it is unpersuasive because she points to no evidence supporting that she has fibromyalgia.

should not have relied on that consideration, substantial evidence supports his finding that Rios at times was "not entirely compliant with her treatment plan": she declined medication for depression in February 2011, and she did not comply with her Plavix or baby-aspirin prescriptions in February 2012. *See* Tr. 610, 750, 791.

## B.    *Medical-Opinion Evidence*

Rios argues the ALJ erred in evaluating opinions of Drs. Thomas and Leal. Doc. 22 at 7–14. As to Dr. Thomas, she argues: (1) the ALJ failed to identify evidence of daily activities he found inconsistent with the opinions; (2) her statements in medical records that she continued to work in 2009 are not inconsistent with her testimony or Dr. Thomas's opinions; (3) the ALJ erroneously stated Rios had not seen Dr. Thomas between June 2013 and October 2014; and (4) the ALJ erroneously stated Dr. Thomas offered no explanation for Rios's decreased treatment. Doc. 22 at 8–13. As to Dr. Leal, she argues the ALJ failed to address his opinions that she cannot perform heavy housework, walk for long periods of time, or lift more than 5 pounds. Doc. 22 at 14. The Commissioner responds: (1) the ALJ properly considered Rios's activities; (2) he adequately explained his determination that Dr. Thomas's opinions were inconsistent with her treatment of Rios; (3) he properly considered the inconsistency between her opinions and other medical evidence; and (4) the statements Rios cites are not Dr. Leal's opinions. Doc. 25 at 11–13.

Regardless of its source, the Social Security Administration "will evaluate every medical opinion" it receives. 20 C.F.R. §§ 404.1527(c), 416.927(c). "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of … impairment(s), including … symptoms, diagnosis and prognosis, what [one] can still do despite impairment(s), and … physical or mental restrictions." 20 C.F.R. § 404.1527(a), 416.927(a). Opinions on issues that are dispositive of a case, such as whether a claimant is disabled or able to work, are not medical opinions because they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

An ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of a claim is rational and supported by substantial evidence." *Id.* "Unless [an ALJ] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981) (internal quotation marks omitted). If an ALJ does not "state with at least some measure of clarity the grounds for his decision," a court will not affirm simply because some rationale might have supported it. *Winschel*, 631 F.3d at 1179.

The Social Security Administration generally will give more weight to the medical opinions of treating sources[9] because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ does not need to give more weight to a treating source's opinion if there is good cause to do otherwise and substantial evidence supports the good cause. *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists if the evidence does not bolster

---

[9]A treating source is a physician, psychologist, or other acceptable medical source who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the treatment or evaluation required for the medical condition. 20 C.F.R. §§ 404.1502, 416.902. An ALJ "may consider an acceptable medical source who has treated or evaluated [a claimant] only a few times" a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)." 20 C.F.R. §§ 404.1502, 416.902.

the opinion, the evidence supports a contrary finding, or the opinion is conclusory or inconsistent with the treating source's own medical records. *Id.* at 1240−41.

Unless the Social Security Administration gives a treating source's opinion controlling weight, it will consider several factors to decide the weight to give a medical opinion: examining relationship, treatment relationship, supportability, consistency, specialization, and any other relevant factor. 20 C.F.R. §§ 404.1527(c), 416.927(c). An ALJ need not explicitly address each factor. *Lawton v. Comm'r of Soc. Sec.*, 431 F. App'x 830, 833 (11th Cir. 2011).

### 1.    *Dr. Thomas*

Rios contends the ALJ erred in finding her daily activities inconsistent with Dr. Thomas's opinions. Doc. 22 at 8–11. She observes many of her treatment records mention no activities; several identify very limited activities; and her activities, taken together, "most likely account for less than an hour a day." Doc. 22 at 8–11.

Contrary to Rios's assertions, the ALJ identified the activities he found inconsistent with Dr. Thomas's opinions. He observed she reported "driving on multiple occasions"; she reported performing some work as a hairdresser in February and December 2009; consultative examining psychologist Dr. Jeremy Zehr noted in October 2010 her activities of daily living were "appropriate"; and she reported taking care of her infant grandson in March 2013. Tr. 792. Substantial evidence supports those findings. *See* Tr. 187, 318, 322, 476–77, 1151.

Rios appears to misunderstand the ALJ's finding on this point. The ALJ did not find Rios's activities of daily living by themselves supported her ability to perform light work, including standing and walking up to 6 hours in an 8-hour period. Instead, he found Rios's daily activities were inconsistent with Dr. Thomas's opinions of virtually incapacitating limitations. He observed Dr. Thomas opined Rios "is incapable of performing virtually any work activity"; "would need to lie down three times every hour"; and "is not able to function." Tr. 792. He found Rios' reported

activities (described above) "suggest[] that [she] does not need to lie down three times every hour, and thus, could perform work **in excess of what Dr. Thomas suggests**." Tr. 792 (emphasis added).

Rios takes issue with the ALJ's finding she had reported working in 2009. Doc. 22 at 11–12. Substantial evidence supports that finding; medical records from February and August 2009 show she reported working in some capacity. *See* Tr. 318, 322. That she also reported being unable to work in December 2009, *see* Tr. 399, is not inconsistent with her report of limited work; the ALJ relied on the reports of work not to find she could work full time but to discredit Dr. Thomas's opinion of incapacitating limitations. The ALJ was entitled to rely on contemporaneous reports of work activity.

Rios argues the ALJ erroneously found that as of October 2014 she had not seen Dr. Thomas since June 2013 and that Dr. Thomas failed to explain the significant decrease in treatment. Doc. 22 at 13. She points to records showing Dr. Thomas had seen her in June 2014 and had noted that Rios no longer had insurance. Doc. 22 at 13.

The ALJ erred in stating Dr. Thomas had not seen Rios since June 2013 (although the ALJ was repeating that statement from a medical record, *see* Tr. 1107). The record contains two treatment notes from Dr. Thomas after June 2013: one in November 2013 and one in June 2014. Tr. 1117, 1135. That error does not warrant reversal. The ALJ's broader point remains true—Rios's treatment, both with Dr. Thomas and in general, decreased significantly beginning in 2013. She saw or spoke to Dr. Thomas at least 11 times from 2011 to 2012 only 4 times from 2013 to 2014. *See* Tr. 601, 629, 641, 674, 682, 689, 698, 708, 718, 1117, 1135, 1144, 1151, 1156, 1161. The record appears to contain no treatment notes from Dr. Thomas from 2015 and just one from 2014. *See* Tr. 1117. Moreover, of the nearly 800 pages of medical records, fewer than 100 are from 2013 or later. *See* Tr. 932–35, 940, 1031–40, 1072–94, 1106–

54, 1207–09. Substantial evidence supports the ALJ's finding of decreased treatment notwithstanding the factual error.

Rios takes issue with the ALJ's finding Dr. Thomas failed to explain the decrease in treatment, pointing to a notation in an October 2014 treatment note that she had lost insurance. Doc. 22 at 13. The record states she "[u]sed to see pain [management] (Dr. Leal), but when she lost her insurance she was unable to go anywhere." Tr. 1107. Another record from June 2014 states, "She missed the deadline for [M]edicaid and now has no insurance." Tr. 1117. Those references do not support Rios's argument. The earliest record mentioning loss of insurance is June 2014 and so does not explain decreased treatment beginning in 2013. The June 2014 note (the only one from Dr. Thomas mentioning loss of insurance) does not indicate she attended fewer appointments after losing insurance. The October 2014 note appears to attribute only her discontinuation of pain-management appointments to her loss of insurance. Neither note contradicts the ALJ's finding that Dr. Thomas failed to explain Rios's decreased treatment beginning in 2013. The ALJ did not rely on the absence of explanation from Dr. Thomas to find there was no explanation for decreased treatment. Rather, he relied on that fact to find Dr. Thomas did not account for Rios's decreased treatment in rendering opinions.

2.    *Dr. Leal*

Rios contends the ALJ failed to address Dr. Leal's opinions that she "is not able to do heavy housework, cannot walk long periods, and cannot lift more than 5 pounds." Doc. 22 at 13–14 (citing Tr. 758–69). The Commissioner responds the statements Rios cites are her own reported limitations and not opinions from Dr. Leal. Doc. 25 at 14.

The Commissioner is correct. The transcript pages Rios cites are "follow-up" forms that pose questions to Rios, not Dr. Leal. *See* Tr. 758–69. For instance, the questions before and after the section containing the identified limitations (titled "Daily Activity?") are "Does Your Pain Travel Anywhere?" and "What Time Of Day Is

Your Pain Worst?" *See, e.g.*, Tr. 758–59. The forms appear to be written by several different people (the handwriting appears to be different on each), and none contain Dr. Leal's signature or initials. *See* Tr. 758–69. Because Rios fails to show the forms contain an opinion from Dr. Leal, the ALJ did not err in not assigning weight to them.

## VI.  Conclusion

The Court **affirms** the Commissioner's decision and **directs** the clerk to enter judgment in favor of the Commissioner and close the file.

**Ordered** in Jacksonville, Florida, on September 22, 2017.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:      Counsel of Record